May it please the Court, I'm Julie Anderson here on behalf of James Bailey. Your Honor, the first issue in this case is whether the Court erred in failing to give plaintiffs jury instruction number 3. And it's our position that that jury instruction was supported by the evidence, it was a correct statement of the law, and it should have been given by the Court. And in addition, in this type of error in a civil case, the prejudice is presumed if the jury instruction should have been given. The case law indicates that an error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. And that's the Sanders case cited in my brief at page 15. And in a civil case, prejudice is presumed and the burden shifts to the defendant to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed. So let me ask you, sir, the paragraph 3 of the district court's jury instruction, one actually given, was number 2.4. Paragraph 3 goes on to say whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight. And what you proposed to do was to ask the Court to define actively resisting arrest, is that right? In essence, that's correct because Why was it necessary or why was the district court legally required to give the definition that you were asking for? It seems pretty obvious, I think. What's confusing or ambiguous about that? Well, I think what was confusing about it is that there may be an argument that he did not follow all the commands of the officers, but the reason he could not follow the commands is because he'd been tased repeatedly. Yeah, but doesn't resisting carry within it the notion of purposely not doing something? Well, I'm not sure. I mean, can you resist something if you're sleeping and somebody says you're resisting arrest because you're not doing what I said because you're sleeping? No one would say that. That's not resisting. Well, the jury may take it to believe that if the officers think he's resisting, even though he's so incapacitated that he can't move, that he's still resisting. But that doesn't say what the people think. It says, was he actively resisting? I mean, it seems to me that the word actively exacerbates it, but resisting includes purposely. Well, I'm not sure that the jury knows that, and that's why because there are a number of cases talking about this very issue that when a person is being arrested Is there any case in which anybody ever said you had to give the instruction like that? I didn't find a case that said that you had to give the instructions, but I cited cases giving the law related to that issue. Right, because it's inherent in the term actively resisting. Right. And I believe that the jury needed to be instructed about it because Well, you stood up in front of the jury and was able to argue that he wasn't resisting as a result of having been tased, correct? Yes, I did. And the judge didn't stop you from doing that, did he? No, the judge did not stop me from doing that, but the jury was also instructed that in jury instruction number five, the counsel's remarks are not evidence and you must follow the law as I give it, whether you agree to it or not. And so in other words, if I don't have a jury instruction to back up the law that I'm telling the jury, which is if the guy is so incapacitated from six tasings that he can't So you think somebody could think that if somebody was unable to stand up, he still could be resisting? I think that somebody could think that, and that's why there's Well, if somebody doesn't have an English language, maybe, but otherwise not. Well, I just know that it's been the subject of many cases because of the fact that Now, unlike the last case we just heard of excessive force, this case went to the jury, right? Yes, it did. In this case, everybody was allowed to tell their story, correct? Mostly, yes. And this incident began sometime before the actual tasing, correct? I'm sorry, I didn't understand. So the tasing wasn't the only incident in this case. No. There was a story. There was a story. And that came out. And not only was he tased six times, according to my client, but he was also taken after the tasing, taken hold of, and his face smashed into the ground about five times and broke his front teeth out. And that was very specifically put in the jury's instruction. The jury either didn't believe him or believed that there was a reason, a justifiable reason for this, and your instruction wouldn't have changed a bit about that. I believe it would have changed it, because the jury would have understood that if the officer is telling him to stay down but he's in a state of either protecting himself in one of the cases, because he knew the officer was about ready to smash him into the ground, so he put his hands underneath his body, and that was towards the end of this whole incident. But in essence, he's not obeying the commands of the officer, but he's also in a state of shock after being tased six times, and he's also incapacitated from doing everything that the officer is telling him to do. And so for that reason, we felt it was important for the jury to understand. Can I address the doctor issue? Yes, Your Honor. Thank you. There's really two issues related to the exclusion of the doctors, and the first issue is whether or not the trial court abused its discretion in excluding Dr. Wall and Dr. Travers because they were not listed in the initial disclosures. And I want to point out that we did argue about this in summer judgment in a little bit different way, but the court had ruled during that summer judgment argument that the witnesses were not expert witnesses, and so they didn't have to have a specific expert report. Dr. Wall is a chiropractor, and Dr. Travers is a medical doctor. And the issue revolves really around a question of law because there is a federal rule, 26A1, talks about how you can supplement your initial disclosures, and it specifically allows those disclosures to be supplemented in a way other than an official, formal supplement to the 26A1. Could you back up a minute and tell me why this made a difference, given the fact that the jury found that there was no liability? There was this bunch of damages, no? It's always hard to know what juries are thinking because we really can't find out about that. But in this particular case, you have my client did testify about what the court allowed him to testify to, which was about his pain, that he'd gone to a couple of doctors, and that he was suffering terribly as a result of this hazing. However, because the doctors weren't allowed to testify, the jury may have thought, well, if he doesn't have a doctor here, obviously he can't be hurt that badly, and that was certainly not true. So in that sense, I believe that he was helped. So you think it therefore went to the question of whether there was excessive force? Is that the issue? In other words, what would the doctor's testimony have gone to? Well, the doctor's testimony would have gone to whether or not he was injured by the hazings and by having his Doesn't matter whether he was injured at the front end, i.e., as to whether there was excessive force? No, it doesn't, but I think it might go to the jury might have felt that it bore on the question of credibility of my client because, as I indicated, he testified about what happened to him, and that he'd been seeing some doctors, but because the doctors themselves weren't allowed to testify. In other words, it would have made them more likely to believe that pain. I think it would have assisted in his credibility. Is there any other evidence you were allowed to introduce on this besides your client's testimony? Like medical records? The judge let us Mr. Bailey testified first, and he testified about how this had affected him. And his girlfriend, who was also here in the courtroom, did testify, and then his brother testified a little bit. But towards the second and third witness on this question, the judge was sustaining objections. It was cumulative information and so on and so forth. So we didn't get everything out that we wanted, obviously, but they were allowed to testify a little bit about those issues. And there were no ñ you weren't allowed to put in any documentary evidence about this? No, there was not. And so with respect to the issue of the CR 26A1, the rule itself says, a party who has made disclosures under Rule 26A or who has responded to an interrogatory request for production or request for admission must supplement or correct its disclosure or response, and then there's capital A, in a timely matter if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional corrective information has not otherwise been known to the parties during the discovery process or in writing. And it was our position that we continuously supplemented this information to the defendants. Mr. ñ Dr. Wall was one of the witnesses, and he was disclosed as early as 4-11-12. The trial in this case was ñ He was disclosed in what sense? Excuse me? He was disclosed in what sense? It was disclosed in the sense that we gave the defendants' counsel the records, and Mr. Bailey was continuously treating with these two doctors, and so, you know, it didn't just stop at the date that we filed the lawsuit. He was still treating. And so we kept ñ every time we'd get new information, we would send it to the defendants' counsel, either by fax or ñ there was a couple times when they came into the office. But there were ten different providers as to which you were doing this. That's true. And with respect to Dr. Wall, and this is what I argued to the court, Mr. Bugme called me in July of 2012 and asked me if Dr. Wall, the chiropractor, was going to testify, and I said yes. And he said, okay, well, then we want your client to go to Seattle and be seen by our independent chiropractor, and we want him to do that. We said that's no problem. Mr. Bailey arranged to go to Seattle. He went there on, I think it was August 10th, and ñ What was the district court's response to that? Was that it was a verbal ñ it didn't happen, or it was a verbal inadequate disclosure, or exactly what? Counsel agreed that it did happen, and they had actually ñ Dr. Reniger had actually reviewed all of Travers' reports in that chiropractic IME, and I have a copy of that with me here today. So he didn't really deny that. What counsel did deny was having the conversation with me about are you going to call Dr. ñ That's what I'm wondering. ñ Wall as a witness. And we did have that conversation. And did the district court find against you on that? Well, he ñ it's hard to know exactly, but he did ñ he was very interested and did ask many questions about did you really do this chiropractic IME, and ñ That's not what I'm asking you. Okay. Did he agree that you said I'm going to call Dr. Wall? I don't think ñ Does the district court make any findings about that? I don't believe he made a finding on that issue. But ñ Would that be inadequate disclosure? Yes. Under the rule that I just cited, it doesn't have to be a formal supplementation. It says it can be ñ you have to do that if additional corrective information has not otherwise been known to the parties during the discovery process or in writing. And in my view, we were continuously supplementing that particular information. And with respect to Dr. Wall, he knew he was going to be called as a witness and had already ñ Well, at that point, we hadn't had the summary judgment yet, and so the judge had not made a determination whether we had to do an expert report or not. At the summary judgment hearing, which was a couple months later, we argued about this issue. The judge ultimately found that these were treating witnesses, and there did not have to be an expert report. So with respect to that particular issue under Federal Civil Procedure 26E1, I believe this is a question of law for the court to decide, and it should be decided de novo with respect to those two witnesses. The third issue, which is a little bit different ñ I've got two minutes left here, but I'm just going to state that with respect to the witness list, these witnesses were on the witness list. In fact, they were on the defendant's witness list. But the issue there was whether my witness list was late. We had tried to do some amended witness list schedules. In fact, Mr. Bugney asked me if I would agree to an amended schedule, and I agreed to his schedule, but I said I'm going to need a few more days on a couple of these issues. Let's talk about it later. And as indicated in my brief, later never came because they weren't available to talk to, and so this issue is ñ So back to what we were saying before. The district court actually does address this question. It says that defendants were told by plaintiff's counsel that plaintiff was going to call Dr. Wall as a witness. This information was provided too late to depose Dr. Wall prior to the discovery cutoff. Is that correct? I don't think it was correct because the defendants knew about this in July. When was the discovery cutoff? I'm not sure what the date of the discovery cutoff was. Was it before or after you told them this? Well, that seemed pretty relevant, doesn't it, since that was the finding. I do have that here if you want me to find it. You can find it later. The decision on this was made just right before trial, like a week before trial. Well, why don't you check? You wanted to have some rebuttal time. You've got a minute left. Why don't you check while we listen to the other side? All right. Thank you. May it please the Court, my name is Mark Johnson. I'm here on behalf of Chelan County and its officers, Risdin and Lehman. We're asking this Court to affirm the judgment on jury verdict. Judge Whaley made an appropriate exercise of discretion in excluding medical witnesses who were not disclosed until shortly before trial. So what's the answer to my question? The discovery cutoff was July 6th. These witnesses were not told by us that they would be or we were not told that these witnesses would testify until October. Now, counsel claims that there was a conversation when she said Whaley was or excuse me, Wall would be testifying before that, but that was not our recollection. And certainly there was nothing in writing. There was no explanation of any opinions they would be giving. In fact, right up to the time of the motion to exclude them, it was unclear whether counsel was intending to call them as experts or as fact witnesses. And I think that was significant because if they were only called as fact witnesses, they could only testify as to their treatment and diagnosis. They didn't see this witness until three and a half years after the incident. So they couldn't have made any causal connection. The jury could not have been advised that, in fact, these rather odd neurological conditions the plaintiff was claiming had anything to do with an incident that had happened three and a half years ago. District courts generally have wide discretion and latitude in managing their case schedules and requiring compliance. This was not the only failure by counsel to comply. I mentioned before, no expert witnesses. Their response to our summary judgment was three weeks late. Their response to identification of trial witnesses was five or six weeks late. We had a terrible time trying to figure out what the case was going to be in terms of the plaintiffs. And we did, it's true, retain our own chiropractor because we simply didn't know. And the chiropractor did his job. Specifically to report Dr. Walsh. Absolutely. Absolutely. You knew about Dr. Walsh. We knew he was out there. We did not know. You knew from the medical records. What we knew is that he had seen the witness, the plaintiff, three and a half years after the incident. And there was one line in his paper that said, these conditions are more probable than not due to the incident. When was, did your expert examine Mr. Bailey? I believe it was July or August. I'm sorry, I don't have that at my fingertips. So after the discovery cutoff. That's my recollection. It might have been June, Your Honor. I just don't remember. I'm sorry. My associate, Mr. Bugby, was handling that. The only thing that's bothering me is that she made a, suppose her story were right and that she did tell you on the telephone. You could have called Dr. Walsh and she said, yes, we are. And you said, then we want to have an IME of him. And she said, fine. Would that be an adequate disclosure? I don't believe so, Your Honor. I think they would at least have to say that. Or put another way, why wouldn't it make the nondisclosure harms? Because we still didn't know. And, in fact, we then waited until the trial witnesses and exhibits were to be identified. I remember talking to Mr. Bugby about this. We still don't have an expert disclosure. There's been no disclosure of doctors. Let's see what they come up with in terms of trial witnesses. And still nothing. In September. When did they have to disclose all of their trial witnesses? September 5th, I believe. Maybe 6th. And they were disclosed October 5th or so, which was, you know, the time we were arguing motions in limine. That's when they really came forward and said, we're going to call Dr. Walsh. That was the only time we had any degree of confidence. And when did they have to disclose their expert witnesses? April. April. Discovery cut off July 6th. So we're talking about months and months after they were expected to identify expert witnesses. And they came up in October and said, well, we're kind of not really an expert. It's just going to be a fact witness, so we didn't have to do an expert disclosure. I'm still somewhat troubled by the formality of the notion that even if she told you that she was going to call Dr. Walsh, and even if you acted on that by having the examination and a specific rebuttal written to Dr. Walsh's analysis, that that still wasn't good enough. What if you had noticed a deposition of Dr. Walsh at that point? Wouldn't you have been allowed? You know, if you said, she told me she's going to call me, so why don't you call me? In our identification of experts, we said we'll only call Dr. Walsh or Dr. Rettinger as a response if, in fact, she identifies Dr. Walsh. And we did not hear from her that she was intending to call Dr. Walsh until October. And the judge said that. I understand that you're saying it isn't true that she told you that. But I'm saying, what if she did tell you that? I still think there has to be some. There's no resolution by the district court. I mean, what confuses me is he does say defendants were told by plaintiff's counsel that the plaintiff was going to call Dr. Walsh a witness. That seems to some degree to credit her story, no? I think he was referring to the later disclosure in October. But that was a formal disclosure. That wasn't just telling you something. It was marginally formal, yeah. I mean, the court was faced with repeated, repeated violations of the court order. This was not a single incident that could have been easily cured. He didn't grant all of our motions to strike, but he was very troubled by the fact that she said, here's a release of medical records. We might call somebody, have fun, basically. And we didn't know, and we still didn't know until October, that there was going to be a witness called or that she intended to. And the court said, I'm sorry, I've got a schedule. I expect my attorneys to follow it. And there have been repeated violations, and I'm going to say you can't testify. No count. As Your Honor pointed out, the other aspect, of course, is the jury never reached the issue of damages. First of all, I don't think these people could have made a causation testimony because they weren't really identified as experts. But even assuming that they could have somehow said Mr. Bailey was injured, well, he testified at some length he was injured. The jury could evaluate his testimony and decide whether this was excessive use of force without knowing what a doctor might say three and a half years later in examining him. It was a moot issue as far as the jury was concerned. They heard two very different interpretations of what happened that night. Mr. Bailey said he was limp. He was not doing anything. He wasn't resisting. He was just lying there, and he was repeatedly tased, and they were having great fun doing it. Our officers gave a very different set of facts. And as you properly pointed out, Judge Whaley allowed the jury to hear both sides. They heard both sides. They believed one side. They did not believe the other side. And they very promptly returned with a jury verdict finding no excessive use of force in connection with the taser, no excessive use of force in connection with the hands-on. And the issue of whether he, three and a half years later, may have symptoms that a doctor might think based solely on Mr. Bailey saying so, was not an issue the jury ever had to reach. Was there any contested fact as to whether these things happened as opposed to whether they were justified? Oh, yes. Oh, yes. Not only are witnesses testified, but the electronic recording devices that tasers have show when there's been a pull of the trigger. We said three times. He said six. He was unable to produce any evidence of six. He said the other officer also tased him, sort of saying, hey, give me your taser. I want a piece of this, too. Completely fabricated, and our officers said that was not the case. There was great difference of opinion regarding whether he was resisting arrest. Mr. Bailey said not that he involuntarily struck him. Did a taser expert testify? No. For neither side. For neither side. Neither side. But we asked for qualified immunity on our summary judgment motion. The judge said, no, I'm not going to go there. I'm going to let the jury decide whether this use of tasers under these circumstances was excessive force or not. The jury heard very dramatic testimony from Mr. Bailey that he died on one taser use. He was resurrected on the following one, that he was screaming, stop, you're killing me, that he was badly injured, and all the rest. They heard the officer's testimony, and they concluded rather promptly, as I said, that one side's testimony was credible and the other was not. The instruction, the additional instruction that was opposed by counsel, was properly rejected for a number of reasons. First, it was unnecessary. The jury knows what active resistance is. And if they don't, counsel is allowed to tell them that a person lying limp and being thrown around like a rag doll, which was Mr. Bailey's testimony, is not active resistance. That was the biggest part of her argument on closing, as you can expect, that he was not actively resisting. Furthermore, the instruction, not only has no court ever said that it is required to be given in a tasing case or any excessive use case, it was misleading in that the proposed instruction said, if there to comply with the instructions may be involuntary, officers are not entitled to use force. That is simply an incorrect statement of the law, of course. The fact that it's possible that an action may be involuntary does not mean that an officer has to walk away and not handcuff someone, for example. So it wasn't even a correct statement of the law in the first place. The judge invited counsel to make her argument in closing that her client could not have been resisting arrest because he was incapacitated. She made that argument. We made our argument based on the evidence that we believe was more credible, that he was indeed trying to get up, that he was holding his arms when Officer Lehman was trying to pull them back to put handcuffs on him, and, of course, there was the whole day's prior activity. This was the fourth time they'd been to the house, and the second time. And the jury resolved it. What's that? And the jury resolved it. The jury resolved it. I mean, we tried to get summary judgment. It would have been, you know, our preference, but we weren't allowed to do that, and the judge felt it was appropriate to let the jury weigh all of this evidence, very conflicting evidence, and he decided, and the jury decided in our client's favor, we just don't believe that the alleged errors that have been raised in this case are sufficient to overturn the judgment on the jury verdict, and we'd ask for that. Thank you. Was there anything in the record of a proffer that demonstrates what Dr. Wall would have testified to or what the other doctor would have testified to? No, there was no official proffer. Again, the only thing we had, I believe, was a one-page report that said something like, he's suffering from these various chiropractic conditions and that it's more probable related to the incident. No indication that the doctor had any knowledge about the incident, which occurred three and a half years later, other than what Mr. Bailey had told him. So we certainly would have argued, if the judge had allowed this witness to be called at all, that he had no basis for an opinion. He certainly wasn't designated as an expert, and in any event, there was no factual basis to support that three and a half year connection between current When was the second? There was another doctor as well. There was another doctor named Travers. He was also seen. He was actually three and a half years before he saw him. I believe Walls was three years and two months or so before he saw him. So these were really, these were experts, excuse me, doctors and a chiropractor that he was sent to, you know, kind of in anticipation of trial. So go back to my earlier question. There was a disagreement about how much, how many tasers there were. What I'm trying to get at is, Well, the doctors have been relevant to his credibility as the argument was being made, i.e., to making it appear that what he said happened actually happened, as opposed to what the officer said actually happened. So the question is, how are they different in a way that the doctor's testimony could have mattered? I don't think it could have mattered. Again, at a minimum, you would have had to have a doctor somewhat close to the time in question so that you have symptoms that clearly are related. What were the differences? There was a number of tasers and what else? In terms of what force was used as opposed to the justification for it. Mr. Bailey claimed that he was shoved forcefully, his head was shoved forcefully into the ground. He had teeth that were chipped, although there was evidence, I can't remember if it came before the jury or not, of other causes of bad tooth decay that he had. But anyway, there was an issue about how forcefully he was shoved into the ground. However, he did walk to the car and he talked to his significant other and said, you know, get some money to bail me out. He wasn't someone that was, you know, on a stretcher or anything like that. And what these doctors could have said, having seen him three and a half years later, I can't imagine the jury would have placed any emphasis on it. The fact of the matter is they found the force that was described by the officers to be reasonable. They heard Mr. Bailey say, no, that's not what happened. It was terrifying. I died. I was screaming, you're killing me. So they had graphic evidence. But it wasn't credible, frankly. And I can't see how a chiropractor coming in three and a half or four years later could possibly have changed the decision with regard to whether the force was excessive three and a half years earlier. Okay. Thank you. Thank you. Your Honors, again, counsel is confusing the issues here because the judge did find that these were treating physicians or treating health care providers. And so we were not required to do an expert report, and the court actually held that. And so it's important to keep that in mind. With respect to the idea that these witnesses wouldn't have helped Mr. Bailey anyway, that's a little bit misleading because although Dr. Wall, I think he started in like maybe November of 2011, Dr. Travers, he didn't even go to Dr. Travers until I believe it was, let's see here. Well, they knew about Dr. Travers since May 8, 2012. But the point I wanted to make about this is they did have all the medical records. And all the medical records included records from Central Russian Hospital, where Mr. Bailey frequently was going in for treatment. And part of that, in his opinion, was related to the taser. He did have an underlying condition called, I guess, Bohrholm's disease. But they agreed that he had the taser. You see, that's why I fought it hard to understand how it would help him. There's no dispute that he was tasered. Because those doctors, the two doctors we wanted to call as expert witnesses, would have had the opportunity to review those other medical records as well to see that this wasn't all of a sudden, you know, two and a half years later he's going to a doctor. He was seeing doctors all the way along. Yeah, but he was tasered. I mean, there's no dispute that he was tasered. So how is the evidence that something bad happened to him because he was tasered going to his credibility? Well, there was an issue about whether he was tased three times or six times. And there was also an issue about whether or not the officers broke off. I know, but how is this medical evidence going to help that? Because these doctors who had been treating him for a time by the time the trial happened would have been able to testify that right now he's in this condition and he has been in this condition since he was tased because they would have had the opportunity to review those other medical records. And so, and the other thing that's important, he made a comment that, oh, we just gave him releases and said go get them. No, finish up, finish your statement. He made the comment that she just gave him blank releases and said go get these yourselves. That's absolutely false. I've got, in the excerpts, it shows fact after fact after fact that I faxed that law from those records. I have a fact slide that shows that. Most of the time defense counsel want to get their own records because they're afraid that we're going to not give them everything. I gave them everything. But he also asked for releases, and then I think they lost a release or it was expired, and I gave him another one. And so I didn't just give him a blank release and say go get it yourself. I gave him everything I had all the way along to the point of, I think, Mr. Bugbee making a point during one of the hearings that I was constantly supplementing the records. Okay. Thank you. Thank you. Thank you. We appreciate your arguments, counsel. The matter is submitted at this time.
judges: Schroeder, Paez, Berzon